# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51662-4-II |
| Respondent, | |
| v. | |
| TIMOTHY J. PETERS, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Timothy Peters appeals from his convictions of second degree assault and two counts of fourth degree assault, asserting that the trial court erred by denying his motion for a mistrial based on a witness's improper character testimony. Because the trial court acted within its discretion when denying Peters's mistrial motion, we affirm.

## FACTS

Mark Allen owns a farm and surrounding land on Jemtegaard Road in Skamania County. Justin Morales lives on Allen's farm with his girlfriend, Catherine Sandoval, and their children. Larry Thompson also lives near the farm in a house he rents from Allen.

On September 4, 2017, Timothy Peters rode his motorcycle to visit Allen at his house located at the dead end of Jemtegaard Road. Morales was working on cars in the barn when he saw a motorcycle drive by at a high rate of speed. After the motorcycle drove past, Morales placed a six-by-six-foot wooden beam halfway across the road. Morales said that he placed the beam on the road so that when the motorcycle driver came back down the road, the driver would

either have to slow down and go around it or stop, in which case he could tell the driver to slow down. Thompson later came to the barn and Morales told him about the speeding motorcycle.

After visiting with Allen for about 40 minutes, Peters drove his motorcycle back down Jemtegaard Road and saw wooden beams[1] on the road. The witnesses disagree about what happened next.

According to Sandoval, Peters drove around the beam and then up the driveway toward the barn. Peters was irate and began screaming profanities. When Morales and Thompson exited the barn, Peters became aggressive and said he would beat them up. Peters shoved Morales's chest and a "brawl" ensued. 1 Verbatim Report of Proceedings (VRP) at 137-38. After several punches were thrown, Peters said he was done fighting and that he was leaving to go get Allen. Peters then took out a knife and began swinging it at Thompson. Morales retrieved Thompson's shotgun from the side of the barn and told Peters to drop the knife. Sandoval called 911. Morales and Thompson provided similar accounts of the incident.

According to Peters, he saw someone holding a shotgun as he approached the beams on his motorcycle. Peters shut off his motorcycle and then saw someone running up behind him. Peters felt someone grab his throat before blacking out. When he regained consciousness, he awoke to people kicking him in the ribs and head. Peters lost consciousness several times as he was beaten. He did not recall Allen coming to the scene, but stated that when he again regained consciousness and began standing up, Allen was holding a shotgun and told him to get back on

---

[1] In contrast with Morales's testimony that there had been only one beam laid "halfway across the road," Peters testified that there were multiple beams "laid all the way across the road." 1 Verbatim Report of Proceedings (RP) at 97; 2 VRP at 215.

the ground or he would shoot him. Peters laid back down on the ground after Allen fired a shot. Peters denied brandishing a knife. Peters believed that someone took money from his wallet during the incident.

According to Allen, he went to the scene with his shotgun after Morales told him that Peters had pulled a knife on the group. When he arrived, he saw Thompson pinning Peters to the ground. Allen convinced Thompson to let Peters sit up while everybody waited for the police to arrive. After some time, Peters stood up and said he was leaving. Allen fired a "warning shot" and told Peters to "sit the [expletive] down. We're gonna wait for the cops." 1 VRP at 193.

Skamania County Sheriff's Deputy William Helton arrived and questioned the group. Peters said that he had been driving too fast, an altercation had occurred, and he was sorry. Peters told Helton to take him to jail and then started to become agitated. Peters became increasingly agitated when Thompson began talking with Helton. Helton detained Peters in his patrol vehicle while he interviewed the other witnesses.

Once in the vehicle, Peters told Helton that he was assaulted and believed someone took money from his backpack. Helton asked Peters if he could look in the backpack for the alleged missing money and Peters agreed. Helton did not find any money in the backpack but saw a Leatherman style folding knife, which Helton seized.

The State charged Peters with two counts of second degree assault and two counts of fourth degree assault. At trial, witnesses testified consistently with the facts above. Video footage from Helton's body camera showing his interaction with Peters and the witnesses was admitted and played for the jury.

3

After Thompson testified about Peters pulling out a knife and the State asked what happened next, Thomson said that he "had done his homework on [Peters]."  1 VRP at 164. Defense counsel objected and the trial court sustained the objection.  After resuming his testimony, the following exchanges took place:

> [State]: Now you mentioned that [Morales] got your shotgun.
> [Thompson]: Yes sir.
> [State]: And—and how did that shotgun end up at the barn—just—how did it end up at the barn?
> [Thompson]: I grabbed it when I went down to go get the brake fluid.
> [State]: Okay.  And what was your reason for grabbing the shotgun?
> [Thompson]: Because I had done homework on—
> [State]: And—
> [Defense Counsel]: Objection Your Honor.
> [State]: —and just what was your reason—what was—
> [Thompson]: —my reason was is I know that he packs either a gun or a knife with him—
> [Defense Counsel]: Objection Your Honor.
> [Trial Court]: Sustained.
> [Thompson]: —I was—
> [Trial Court]: Don't answer—
> [Thompson]: —sorry.
> [Trial Court]: Disregard—
> [State]: It's okay.
> [Trial Court]: —the last statement.
> . . . .
> [State]: Okay. And when did you bring [the shotgun] to the—the ba—the barn?
> [Thompson]: After I had walked up and saw that the 6 x 6 was drug across the road. I was concerned about who the actual person was.
>     And when I walked down to my house to grab the brake fluid a little voice in the back of my head was as if it is this person you need to make sure that you're armed because of what you've heard about this person.

1 VRP at 165-66.  Defense counsel again objected, and the trial court addressed the objection outside the presence of the jury.

After the jury left the courtroom, defense counsel moved for a mistrial, arguing that Thompson had repeatedly answered the State's questions in a nonresponsive and prejudicial

manner. The State argued that a mistrial was not warranted and that an instruction telling the jury to disregard Thompson's improper testimony would be sufficient to cure any prejudice.

The trial court denied the mistrial motion, reasoning that Thompson's statements were not so prejudicial as to deny Peters a fair trial. The trial court instructed Thompson to listen to the questions being asked, to answer only those questions, and to stop speaking when there has been an objection. When the jury returned to the courtroom, the trial court instructed it as follows:

> I have sustained a number of objections that have been made up to this point in time and ask you to disregard certain evidence that has been presented.
> Again I just want to remind you again to go ahead and disregard any evidence that the court has asked you not to consider up to this point in time. Any opinion testimony regarding Mr. Peters that's been provided by the witness up to this point in time you are to disregard at this point.

1 VRP at 171.

The jury returned verdicts finding Peters guilty of one count of second degree assault and two counts of fourth degree assault; it could not reach a verdict on Peters' remaining second degree assault charge or on fourth degree assault as an inferior-degree offense to that charge. Peters appeals from his convictions.

## ANALYSIS

Peters contends that the trial court abused its discretion by denying his motion for a mistrial. We disagree.

We review a trial court's decision denying a mistrial motion for an abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). A trial court abuses its discretion when no reasonable judge would have reached the same conclusion. *Emery*, 174 Wn.2d at 765. "The trial court should grant a mistrial only when the defendant has been so prejudiced that

5

nothing short of a new trial can ensure that the defendant will be fairly tried." *Emery*, 174 Wn.2d at 765.

When reviewing whether a trial court abused its discretion by denying a mistrial motion, we give "great deference to the trial court because it is in the best position to discern prejudice." *State v. Smith*, 124 Wn. App. 417, 428, 102 P.3d 158 (2004), *aff'd* 159 Wn.2d 778, 154 P.3d 873 (2007). The determination of whether admission of evidence at trial justifies a mistrial depends on three factors: (1) whether the error in admitting the evidence was serious enough to materially affect the trial's outcome, (2) whether it was cumulative of other evidence, and (3) whether the trial court properly instructed the jury to disregard the evidence. *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

Here, upon consideration of the relevant factors, we conclude that the trial court acted within its discretion when denying Peters's mistrial motion. In arguing that the trial court abused its discretion, Peters relies on *State v. Escalona*, 49 Wn. App. 251, 742 P.2d 190 (1987). In that case, the defendant was accused of assaulting the victim with a knife. *Escalona*, 49 Wn. App. at 252. At trial, the alleged victim testified that he was afraid because the defendant "has a record and had stabbed someone." *Escalona*, 49 Wn. App. at 253. The trial court denied the defendant's mistrial motion and instructed the jury to disregard the testimony. *Escalona*, 49 Wn. App. at 253. On appeal, Division One of this court concluded that the trial court abused its discretion by denying the mistrial motion because the irregularity was "extremely serious" given the paucity of credible evidence, the testimony was not cumulative, and the irregularity could not be cured by the instruction, reasoning:

> [D]espite the court's admonition, it would be extremely difficult, if not impossible, in this close case for the jury to ignore this seemingly relevant fact. Furthermore,

the jury undoubtedly would use it for its most improper purpose, that is, to conclude that Escalona acted on this occasion in conformity with the assaultive character he demonstrated in the past.

*Escalona*, 49 Wn. App. at 255-56.

*Escalona* is distinguishable from the present case. First, Thompson's unsolicited testimony regarding his impression of Peters's character and reputation for carrying a gun or knife was not as serious as the irregularity in *Escalona*. Unlike in *Escalona*, where the alleged victim testified that the defendant had previously committed a crime similar in nature to the one for which the defendant was accused, here Thompson did not testify that Peters had previously assaulted anyone or that he had a criminal record. And, although Thompson's improper testimony that he "had done his homework" on Peters and that he felt he needed to be armed when confronting Peters "because of what [he has] heard," vaguely suggested that Peters had a reputation for being dangerous; Thompson did not provide any basis for his impression of Peters' reputation. 1 VRP at 164, 166. We therefore conclude that Thompson's improper character testimony did not arise to the seriousness of the irregularity in *Escalona*.

Second, although Thompson's impression that Peters had a reputation such that he felt the need to be armed with a shotgun when confronting him was not cumulative to any properly admitted evidence at trial, the uncontested evidence at trial showed that Peters possessed a knife on the date of the incident. Therefore, although not cumulative, Thompson's improper testimony regarding Peters' reputation for carrying a knife or gun had little prejudicial effect on any fact at issue in the trial.

Finally, the trial court here properly sustained defense counsel's objections and instructed the jury to disregard Thompson's improper testimony. And we presume that the jury followed

7

No. 51662-4-II

the trial court's instruction. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Because, unlike in *Escalona*, Thompson did not testify that Peters had committed an act similar to that for which he was on trial, we conclude that the trial court's curative instruction was sufficient to ameliorate any prejudice resulting from Thompson's vague suggestion that Peters had a reputation for being dangerous and that Peters had a reputation for carrying a knife or gun. Accordingly, we hold that the trial court acted within its discretion when denying Peters's mistrial motion and, thus, affirm his convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Lee, A.C.J.

_____
Cruser, J.

8